**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

UNITED STATES OF AMERICA,

     Plaintiff,

v.            CRIMINAL ACTION NO. 2:16-cr-00218

DON LAMONT WILKERSON,

     Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are the following motions filed by Defendant Don Lamont Wilkerson ("Defendant"): Motion to Suppress Evidence of Alleged Drug Distributions, (ECF No. 50-1), Motion to Suppress Custodial Statements, (ECF No. 51), and several motions in limine, (ECF Nos. 52, 53, 54, 55, 56, 57, 58, 59).[1]  Also before the Court is the United States' Motion in Limine to Exclude Arguments and Evidence Regarding Potential Penalties Facing Defendant. (ECF No. 47.)

For reasons stated on the record at the pretrial motions hearing held on August 8, 2017, the Court **GRANTS** Defendant's Motion in Limine to Exclude Witnesses from Courtroom Pursuant

---

[1] Also pending is Defendant's Motion to Seal Motion to Suppress.  (ECF No. 50.)  At the pretrial motions hearing on August 8, 2017, defense counsel represented that the purpose of the motion to seal was to protect the identity of a confidential informant who is named in a one-page exhibit attached to the motion.   To avoid sealing ninety-nine other pages of briefing and exhibits, the Court suggested that Defendant re-file that exhibit with the confidential informant's name redacted.  (ECF No. 80 at 4.)  The Court then noted that it would deny the motion on that basis.  However, Defendant did not re-file the exhibit following the hearing.   For this reason, the Court **ORDERS** Defendant to file a redacted copy of Exhibit G attached to the motion, (ECF No. 50-8), at which time the Court will replace the image and deny the motion to seal.

to Rule 614, (ECF No. 55), and Motion in Limine to Allow Defendant to Appear at Trial Without Restraints in Presence of Jury, (ECF No. 57); **DENIES AS MOOT** the Motion in Limine to Prohibit Introduction of Rule 404(b) Evidence of Crimes, Wrongs or Other Acts, (ECF No. 53), Motion in Limine to Prohibit Introduction of Undisclosed Physical Evidence, (ECF No. 54), and Motion in Limine to Prohibit Reference to Supposed Origin of Controlled Substances, (ECF No. 56); and **DEFERS** until trial a ruling on the Motion in Limine to Prohibit Any Expert Testimony by Investigating Officer, (ECF No. 52), Motion in Limine to Prohibit Introduction of Witness Testimony Characterizing Audio and Video Recordings, (ECF No. 58), and Motion in Limine to Prohibit the Introduction of Undisclosed MDENT Policies and Procedures for Searching Informants and Vehicles, (ECF No. 59).

For the reasons set forth below, the Court **DENIES** Defendant's Motion to Suppress Evidence of Alleged Drug Distributions, (ECF No. 50-1), **DENIES AS MOOT** Defendant's Motion to Suppress Custodial Statements, (ECF No. 51), and **GRANTS** the United States' Motion in Limine to Exclude Arguments and Evidence Regarding Potential Penalties Facing Defendant, (ECF No. 47).

## I. BACKGROUND

Defendant is named in a three-count indictment charging him with distribution of a quantity of methamphetamine in violation of 21 U.S.C. § 841(a)(1). (ECF No. 1.) On July 31, 2017, Defendant filed the current motions to suppress all evidence related to three controlled buys allegedly occurring on September 9th, 13th, and 26th of 2016, as well as statements made by Defendant during the execution of a search warrant at his mother's residence on May 5, 2016. The United States responded to Defendant's motions on August 7, 2017. At a pretrial motions

hearing held on August 8, 2017, the Court heard arguments from the parties and testimony from Corporal Justin Hackney ("Cpl. Hackney") and Detective Keven Allen ("Det. Allen") of the Metropolitan Drug Enforcement Network Team ("MDENT"). The following facts were derived from Defendant's briefs, MDENT records attached to Defendant's motions, and testimony adduced during the hearing. The facts are not in dispute except where indicated.

The circumstances leading up to the challenged evidence began in April 2016, when Det. Allen received information about suspicious activity at 3714 Virginia Avenue in Charleston, West Virginia. (ECF No. 50-1 at 2–3.) Det. Allen drove to the residence and learned that two vehicles parked outside residence were registered to Donna Wilkerson, who is Defendant's mother. (*Id.* at 3.) Det. Allen was familiar with Defendant from a previous investigation and federal drug conviction. (*Id.*) In response, Det. Allen conducted three trash pulls at the residence in April and May during which he found drug paraphernalia and a substance that field-tested positive for marijuana. (*See id.* at 3–4.) Det. Allen subsequently applied for and received a search warrant for the residence. (*See id.*; *see also* ECF No. 50-2.)

MDENT detectives conducted the search authorized by the warrant of 3714 Virginia Avenue on May 5, 2016. (ECF No. 50-1 at 5; ECF No. 50-3 at 5.) Defendant was at the residence during the search where he was handcuffed and read his *Miranda* rights. (ECF No. 50-1 at 5; ECF No. 50-3 at 5 (noting that Defendant's son also was temporarily handcuffed and that Defendant told him, "they are here for me, not you").) Defendant verbalized his desire to speak to an attorney. (ECF No. 50-1 at 5; ECF No. 5-3 at 5.) While Det. Allen wrote in his report that "[n]o formal questioning took place after this point," Det. Allen asked Defendant about his employment status, living situation, and the identity of the residence's tenant. (*See* ECF No. 50-

3 at 5.) The detectives found approximately $4,361.00 in Defendant's pocket as well as mechanical scales and partially smoked marijuana roaches inside the residence. (*Id.*) Further, Det. Allen stated that he learned that three vehicles parked at the residence were in Defendant's possession, and he informed Defendant that he would be seeking a search warrant for those vehicles. (*See id.*) On one of the vehicles' key rings, Det. Allen noticed a key with "Move'n Store" on it, which he believed was related to a storage unit application found during one of the trash pulls. (*Id.*)

After completing the search of the residence, the law enforcement officers split up—several stayed in front of the Virginia Avenue house with the vehicles and others went to Capitol Mini-Storage in South Charleston, West Virginia. (*See id.* at 5–6.) Meanwhile, Det. Allen applied for and received search warrants for the three vehicles parked outside the residence and Defendant's storage unit at Capitol Mini-Storage. (*Id.* at 6; *see also* ECF Nos. 50-4, 50-5.) Multiple bags of suspected marijuana were located in one of the vehicles while four sets of digital scales, mail and legal documents addressed to Defendant, and a large amount of suspected methamphetamine and small amount of suspected heroin—both yielding positive field tests—were discovered in the storage unit. (*See* ECF No. 50-3 at 6.) Consequently, the three vehicles were seized, and the items from the storage unit were transported to MDENT's office along with previously discovered evidence. (*Id.*)

Over four months later, on September 8, 2016, Cpl. Hackney met with a confidential informant ("CI #1") who gave him information about Defendant based on two-and-a-half to three years of association during which CI #1 purchased large quantities of methamphetamine from Defendant. (*See id.* at 9.) The next day, Cpl. Hackney met with CI #1 and another confidential

informant ("CI #2") to get CI #1 to place a recorded call to Defendant and set up a controlled buy of crystal methamphetamine. (*Id.*) Several MDENT officers, including Det. Allen, assisted Cpl. Hackney with a controlled buy on September 9, 2016, in a Kroger parking lot in Charleston. (*Id.*) CI #1 completed the controlled buy with Defendant, who drove a silver Ford Expedition registered to his mother, Donna Wilkerson. (*Id.*) CI #1 and CI #2 met with Cpl. Hackney after the buy and turned over to him a bag of suspected methamphetamine acquired during the transaction, which field-tested positive. (*Id.* at 10.) That same afternoon, Cpl. Hackney completed a search warrant for a GPS device applied to the vehicle Defendant was driving in an attempt to locate larger quantities of methamphetamine that CI #1 informed law enforcement was in Defendant's possession. (*See id.*) Evidence from this first controlled buy includes "recorded telephone calls, audio and video . . . , alleged statements by defendant, observations of law enforcement and their two confidential informants, and a quantity of suspected methamphetamine . . . ." (ECF No. 50-1 at 9.)

On September 13, 2016, CI #1 and CI #2 met with Cpl. Hackney, and CI #1 called Defendant to arrange another buy. (ECF No. 50-3 at 10.) Defendant agreed to meet with CI #1 at the same Kroger parking lot as the first buy. (*Id.*) Defendant arrived at the parking lot in a silver Mercedes similarly registered in his mother's name, and CI #1 purchased with pre-recorded buy money another ounce of suspected methamphetamine, which field-tested positive. (*Id.* at 11.) Evidence from this buy includes recorded telephone calls, audio and video surveillance, Defendant's statements, observations of the detectives and the two confidential informants, and the purchased methamphetamine. (ECF No. 50-1 at 12.) While CI #1 and CI #2 met with Cpl.

Hackney after the buy, other detectives followed Defendant in the silver Mercedes he was driving in an unsuccessful attempt to apply a GPS device to the vehicle. (ECF No. 50-3 at 11.)

A third controlled buy took place on September 26, 2016. (*See id.* at 11–12.) CI #1 arrived at MDENT offices that day and placed a phone call to Defendant to arrange a buy. (*Id.* at 11.) The two agreed to meet at the same Kroger parking lot where the first two controlled buys took place. (*See id.*) Defendant called CI #1 over an hour after they were supposed to meet to inform him[2] that "he had to pick the methamphetamine up" and requested that CI #1 meet him instead at a Gabriel Brothers ("Gabe's") store. (*See id.* at 12.) After CI #1 approached Defendant's car in the Gabe's parking lot and spoke with him for "a short period of time," CI #1 walked away from the vehicle. (*Id.*) Then, the U.S. Marshal Service and MDENT detectives moved toward Defendant's car and arrested him. (*Id.*; *see* ECF No. 50-1 at 13–14.) CI #1 met with Cpl. Hackney after the buy and turned over the recording device and methamphetamine, which field-tested positive. (ECF No. 50-3 at 12–13.) Evidence from this controlled buy includes "recorded telephone calls, audio and video allegedly depicting a methamphetamine distribution, alleged statements by defendant, observations of law enforcement and [CI #1], a quantity of suspected methamphetamine . . . , [and] United States currency . . . ." (ECF No. 50-1 at 14.)

## II.  *LEGAL STANDARD*

"The burden of proof is on the party who seeks to suppress the evidence." *United States v. Hunter*, 63 F. Supp. 3d 614, 619 (E.D. Va. 2104) (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)). If the defendant provides a basis for the motion to suppress, the burden shifts to the

---

[2] It was revealed at the pretrial motions hearing that CI #1 is a male. (*See* ECF No. 80 at 83.)

prosecution to prove the challenged evidence's admissibility by a preponderance of the evidence. *See id.*; *see also United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). During a pretrial hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *Hunter*, 63 F. Supp. 3d at 619 (quoting *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir. 1993)) (internal citation omitted); *see also Columbus-Am. Disc. Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) ("[I]n the usual case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious example." (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 623 (1993))).

## *III. DISCUSSION*

Defendant advances a myriad of arguments in the suppression motion and post-hearing brief in support of his position that the evidence obtained from the three controlled drug buys occurring on the 9th, 13th, and 21st of September 2016 should be inadmissible at trial. First, Defendant argues that this evidence is the fruit of multiple searches that all violated his Fourth Amendment rights—those being the search at 3714 Virginia Avenue, the search of the vehicles parked at that residence, and the search of Defendant's storage unit, which all occurred on May 5, 2016. (*See* ECF No. 50-1 at 14–25; ECF No. 83 at 2–6.) Further, Defendant argues that because a GPS tracking device was placed on the vehicle he drove to the first controlled buy before a search warrant was signed, an unreasonable search occurred requiring suppression of all evidence from the controlled buys. (*See* ECF No. 50-1 at 25–29; ECF No. 83 at 6–12.)

Defendant also argues that suppression is the appropriate remedy for law enforcement's refusal to timely arrest him after the issuance of a state warrant on August 18, 2016, which Defendant avers is a violation of his Fifth Amendment rights. (*See* ECF No. 50-1 at 30–32; ECF No. 83 at 12–15.) Defendant further states that law enforcement "permitt[ed] and/or incit[ed] a confidential informant to violate the law" in two respects: (1) by allowing CI #1 to drive to the controlled buys without a valid license, (*see* ECF No. 50-1 at 32–33; ECF No. 83 at 15–24), and (2) by utilizing CI #1 when he "was a fugitive from justice" at the time of the third controlled buy, (*see* ECF No. 83 at 24–28 (raising this second argument only in the post-hearing brief)). Defendant claims that because law enforcement knew that a confidential informant was acting unlawfully during the course of the controlled buys, the evidence resulting from the buys must be suppressed. Additionally, Defendant avers that law enforcement violated West Virginia Code § 62-1D-13 in failing to register the electronic recording devices with the state's public safety department, rendering recordings made with the devices inadmissible. (*See* ECF No. 50-1 at 33; ECF No. 83 at 28–34.) Finally, Defendant argues that even if these individual instances do not violate his constitutional rights on their own, when assessed holistically, the evidence resulting from the controlled buys must be suppressed and the indictment against him must be dismissed. (*See* ECF No. 50-1 at 33–34; ECF No. 83 at 34–36.)

In his separately filed Motion to Suppress Custodial Statements, Defendant avers that during the search of 3714 Virginia Avenue on May 5, 2016, Defendant was handcuffed and read his *Miranda* rights, "at which time [he] stated that he wanted to speak to an attorney." (ECF No. 51 at 1.) Defendant states that while in handcuffs and after requesting to speak to an attorney, Det. Allen asked Defendant at least three questions that Defendant allegedly answered. (*Id.*)

Further, Det. Allen wrote in his warrant application to search the three vehicles parked in front of the residence that after asking for Defendant's consent to search them, "[Defendant] became very hyper and started yelling at me that he wanted a lawyer." (*Id.* at 2.) Because Defendant allegedly did not initiate any further communication or conversation with the officers after he verbalized a desire to speak with an attorney, he argues that these alleged statements were made in violation of his Fifth Amendment rights and are inadmissible at trial. (*See id.*)

In the United States' response to Defendant's motions, it first argues that the three controlled buys were significantly attenuated from the three searches occurring in May 2016, rendering the legality of the searches irrelevant. (*See* ECF No. 64 at 6–8 (citing *Utah v. Strieff*, 136 S. Ct. 2056, 2064 (2016); *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)); ECF No. 84 at 1–3.) It also argues that the independent source doctrine provides a separate basis for rejecting Defendant's "fruit of the poisonous tree" argument. (ECF No. 64 at 8–9 (citing *Murray v. United States*, 487 U.S. 533 (1988)).) The United States further argues that the legality of the GPS tracker's placement on the car Defendant drove to the first controlled buy is irrelevant because the United States does not plan on producing any evidence resulting from the GPS tracker in its case-in-chief. (*See* ECF No. 64 at 9–10; ECF No. 84 at 3.) The United States maintains that there is no basis in law to suppress evidence from the controlled buys under Defendant's remaining four arguments: (1) law enforcement did not promptly arrest Defendant after a state warrant was issued in August 2016, (2) CI #1 drove to the controlled buys without a valid license, (3) CI #1 was on probation and was a fugitive as of the day of the third controlled buy,[3] and (4) the recording devices used during the buys were not registered in accordance with state law. (*See* ECF No. 64

---

[3] The United States also avers that this argument should not be considered because it was not raised in Defendant's original motion to suppress and, thus, is untimely. (*See* ECF No. 84 at 5–6.)

at 10–12; ECF No. 84 at 3–7.) Lastly, the United States argues that because no misconduct by law enforcement has been proven in this case, Defendant's totality of the circumstances argument is meritless. (ECF No. 84 at 7.) While the United States provides no written response to Defendant's Motion to Suppress Custodial Statements, it reiterated at the motions hearing that it does not intend to present any evidence from the May searches, including any statements made by Defendant. (*See* ECF No. 80 at 5.)

A. *Evidence from September 2016 Controlled Buys*

The exclusionary rule directs trial courts to exclude unlawfully seized evidence from a criminal trial and covers both evidence directly resulting from an illegal search or seizure and "evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)); *see also Wong Sun v. United States*, 371 U.S. 471, 484 (1963). The Supreme Court has recognized exceptions to the exclusionary rule, two of which are at issue here.[4] First, "the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Strieff*, 136 S. Ct. at 2061 (citing *Murray*, 487 U.S. at 537). Second, and more relevant to the current discussion, is the attenuation doctrine. Pursuant to the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected

---

[4] The Government noted at the pretrial motions hearing that the inevitable discovery doctrine could also apply to render the evidence from the controlled buys admissible, *see Nix v. Williams*, 467 U.S. 431, 443–44 (1984), but it did not expand upon this argument at the hearing or in its response to Defendant's post-hearing brief. (*See* ECF No. 80 at 108–13; ECF No. 84.) Nevertheless, the Court need not discuss that doctrine to resolve the pending suppression motions.

by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). As the Supreme Court has reiterated, "[a] criminal prosecution is more than a game in which the Government may be checkmated and the game lost merely because its officers have not played according to the rules." *United States v. Ceccolini*, 435 U.S. 268, 279 (1978) (quoting *McGuire v. United States*, 273 U.S. 95, 99 (1927)).

Courts must assess three relevant factors when determining whether evidence is sufficiently attenuated. *See United States v. McKinnon*, 92 F.3d 244, 247 (4th Cir. 1996) (discussing *Ceccolini*, 435 U.S. at 270–80). First, courts look toward the temporal proximity between the unlawful conduct and the evidence that a defendant seeks to exclude. *See Brown*, 422 U.S. at 603. Second, the presence of intervening circumstances will inform the court as to the degree of attenuation. *See id.* at 603–04 (citing *Johnson v. Louisiana*, 406 U.S. 356, 365 (1972)). Finally, and of "particular[]" significance, courts "examine 'the purpose and flagrancy of the official misconduct.'" *Strieff*, 136 S. Ct. at 2062 (quoting *Brown*, 422 U.S. at 604). "What suffices to dissipate the taint from derivative evidence depends on the specific facts and circumstances of each case . . . ." *United States v. Najjar*, 300 F.3d 466, 477 (4th Cir. 2002) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49 (1973)). While all three factors do not need resolved in favor of the United States, *see United States v. Seidman*, 156 F.3d 542, 549 (4th Cir. 1998) (citation omitted), the Government bears the burden of establishing attenuation. *See Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (per curiam).

First, there is no bright-line test for temporal proximity, but courts have found that the passage of "substantial time" between the illegality and the obtained evidence is required to

support attenuation. *See id.* (finding no indication that "substantial time" passed between the defendant's unlawful removal from his home in handcuffs and his confession after only ten to fifteen minutes of interrogation); *Brown*, 422 U.S. at 604 (concluding that a time span of "less than two hours" between an unconstitutional arrest and a confession was too short an interval); *United States v. Toledo*, 615 F. Supp. 2d 453, 466–67 (S.D. W. Va. 2009) (noting that a ten-day gap between an unlawful arrest and confession was a "considerable interlude also counsel[ing] in favor of admission").[5] At least in the context of a confession following an illegal arrest, the Supreme Court has regularly held that "a difference of a few hours is not significant . . . ." *See Taylor v. Alabama*, 457 U.S. 687, 690–91 (1982) (citing *Dunaway v. New York*, 442 U.S. 200, 217 (1979); *Brown*, 422 U.S. at 601, 603). Nevertheless, this first element is often evaluated in conjunction with the second and third elements because "the mere passage of time cannot serve to make tainted physical evidence admissible." *See Najjar*, 300 F.3d at 478 (providing that "the temporal aspect can inform the attenuation analysis, for instance, by providing a context to the government's further investigations"); *see also United States v. Watson*, 703 F.3d 684, 697 (4th Cir. 2013) ("Here, this 'temporal proximity' factor weighs strongly in Watson's favor because he was not freed from the officers' custody at any point between his initial [unlawful] seizure and the time he made his incriminating statement.").

---

[5] *See also United States v. Murphy*, 703 F.3d 182, 191 (2d Cir. 2012) (finding that "the lapse of less than one minute between the end of the [unlawful] stop and the consent to search" was not "substantial time"); *United States v. Lambis*, 197 F. Supp. 3d 606, 613 (S.D.N.Y. 2016) (finding that two events occurring on the same evening "were in close temporal proximity"); *United States v. Bergin*, 732 F. Supp. 2d 1235, 1250 (M.D. Fla. 2010) (noting that temporal proximity could not be "determined precisely" because "anywhere from less than an hour to three to four hours elapsed between the unlawful Third Entry and the consent"); *Ukawabutu v. Cathel*, No. 06-837 (NLH), 2008 WL 1901004, at *17, 33 (D.N.J. Apr. 24, 2008) (finding that "[t]here was a very substantial time gap" between two confessions—the first unlawful but the second lawful—obtained twelve hours apart on the same day), *reconsideration denied*, 2008 WL 4307450, at *1 (Sept. 16, 2008); *United States v. Green*, 277 F. Supp. 2d 756, 762 (E.D. Mich. 2003) (finding that this factor "weigh[ed] heavily" in the defendant's favor because "less than one hour" passed between the illegal search and his confession).

Second, intervening circumstances may cure a taint arising from law enforcement's allegedly unlawful conduct. For example, "a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest." *See United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (citing cases from the First, Fifth, Eight, Tenth, and Eleventh Circuits that stand for the proposition that a new and distinct crime will purge the taint of initial police misconduct). As the Fourth Circuit has recognized, "[a] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *See id.* (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982)); *see also United States v. Richard*, 825 F. App'x 323, 326–28 (4th Cir. 2013). The Supreme Court has acknowledged that determining the necessity of exclusion based, in part, on intervening circumstances "attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies it." *United States v. Leon*, 468 U.S. 897, 911 (1984) (quoting *Brown*, 422 U.S. at 609 (Powell, J., concurring in part)). This is particularly true in cases where a witness, with no knowledge of alleged police misconduct and in an act of free will, comes forward with incriminating information about the defendant. *See Ceccolini*, 435 U.S. at 280 ("The cost of silencing ['a willing and knowledgeable witness'] is too great for an evenhanded system of law enforcement to bear in order to secure such a speculative and very likely negligible deterrent effect.").

Finally, in evaluating the purpose and flagrancy of the official misconduct, courts look to the impropriety of law enforcement's actions in light of the relevant circumstances. *See Brown*, 422 U.S. at 605. Evidence of negligence alone is not enough to reach the level of "purpose and

flagrancy" required to support suppression. *See Strieff*, 136 S. Ct. at 2063 ("Officer Fackrell was at most negligent. . . . But these errors in judgment hardly rise to a purposeful or flagrant violation of Strieff's Fourth Amendment rights."). For example, conduct was held to be purposeful and flagrant in *Wong Sun*, where, without a warrant, "six or seven officers went to the business of James Toy, a man alleged to have sold heroin, broke open his door, followed him into his bedroom, and almost immediately handcuffed and arrested him." *See Seidman*, 156 F.3d at 550 (citing 371 U.S. at 474). Similarly, the police officers in *Brown* broke into the defendant's apartment and searched it without either probable cause or a warrant. *See* 422 U.S. at 592. As the *Brown* Court implied, an officer's admission of misconduct will greatly aid the defendant's position. *See id.* ("The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives . . . in their testimony . . . ."). While courts must view "with somewhat heightened suspicion" a warranted search justified by a prior warrantless search, this does not by itself justify suppression. *See Najjar*, 300 F.3d at 479.

Defendant maintains that attenuation cannot save the evidence from the controlled buys here because "there exists a direct connection between MDENT's unlawful May 5, 2016 searches and MDENT's ability to place into context and pursue information received from [CI #1] on September 8, 2016." (ECF No. 83 at 2, 4 (arguing that the allegedly unlawful searches allowed the officers to "make the connection between Dub and Mr. Wilkerson" after meeting with CI #1 (quoting ECF No. 80 at 44–45)).) Defendant argues that without the information learned during the May 2016 searches, law enforcement would not have "restart[ed] their investigation" of him. (*Id.* at 5.) He contends that, with regard to temporal proximity, the passage of four months does not mean that the evidence obtained in the subsequent controlled buys is "necessarily attenuated."

(ECF No. 80 at 92.)   As for intervening circumstances, Defendant argued at the hearing that law enforcement's initial meeting with CI #1 did not constitute an intervening circumstance because "[i]t takes two to meet[,] and the Government clearly had this information [that] allowed it to put two and two together in the meeting and then decide to pursue Mr. Wilkerson."   (*Id.*)

Defendant's position that law enforcement's conduct meets the threshold level of purpose and flagrancy is grounded in Det. Allen's submission of a "bare bones affidavit" lacking probable cause to search the residence.   (ECF No. 50-1 at 20.)   Defendant argues that Det. Allen "omitted from his search warrant affidavit the critical fact that the reported findings of the trash pulls were consistent with personal marijuana use" in violation of *Franks v. Delaware*.   (*See id.* (citing 438 U.S. 154, 155–56 (1978)).)   Ultimately, Defendant maintains that each of the Government's unlawful actions were purposeful and in furtherance of a desire to build a case against Defendant based on knowledge that he kept additional methamphetamine at an unknown location, (*see* ECF No. 80 at 33, 92), and that without the allegedly illegal searches from May 2016, "the United States would not have developed any evidence of the three alleged controlled drug distributions," (ECF No. 50-1 at 24–25).[6]

The Court begins by noting that over four months passed between the searches in May 2016 and law enforcement's initial meeting with CI #1.   Defendant has never claimed that in the

---

[6] Defendant also suggested at the motions hearing that certain police misconduct during the September 2016 controlled buys provides insight into the level of flagrant conduct by the officers investigating Defendant.   For example, Defendant argues that flagrancy is evidenced by the officers' placement of the GPS tracker on Defendant's car without first obtaining a warrant when "they've been told repeatedly not to do this . . . ."   (ECF No. 80 at 67 ("I'[m] not citing any law for that.   I'm just saying that's the defendant's position.").   *But see* ECF No. 50-1 at 25–29 (relying on *United States v. Terry*, No. 2:16-cr-00175, 2017 WL 1028590, at *1 (S.D. W. Va. Mar. 16, 2017)).)   Defendant further claims that it was flagrant to compel a confidential informant to drive without a license in light of the possibility that the informant may have expressed "hesitancy to break the law" and to use a confidential informant who was a "fugitive from justice" at the time of the third controlled buy.   (*Id.* at 81 (relying on *United States v. Spicer*, No. 2:16-00205, 2016 WL 7493975, at *1 (S.D. W. Va. Dec. 30, 2016)); ECF No. 83 at 24–28.)

interim MDENT continued investigating him.   (*See* ECF No. 83 at 5 (describing the September investigation as a "restart"); *see also* ECF No. 80 at 105.)   While Defendant does not cite any case law supporting the notion that over four months is not "substantial time" for purposes of temporal proximity, *see Kaupp*, 538 U.S. at 633; *see also Brown*, 422 U.S. at 604, the Court notes that the majority of courts grappling with the temporal proximity element of attenuation typically assesses situations involving mere hours or days between alleged police misconduct and challenged evidence, *see* cases cited *supra* note 5 and accompanying text.   The passage of over four months here strongly suggests attenuation.   Nevertheless, the Court recognizes that the passage of this amount of time cannot alone cure any alleged previous defects by the MDENT officers who were investigating Defendant, and this element must be analyzed in conjunction with the attenuation doctrine's other two elements.   *See Najjar*, 300 F.3d at 478.

For the purposes of the analysis, the Court will assume, without deciding, that the search of the 3714 Virginia Avenue residence, the searches of the three vehicles, and the search of the storage unit in May 2016 all violated Defendant's Fourth Amendment rights despite the fact that warrants were acquired before each search.[7]   (*See* ECF Nos. 50-2, 50-4, 50-5.)   Regardless, to

---

[7] The Court will also assume, without deciding, that the placement without a warrant of the GPS tracker on the vehicle that Defendant drove to the first controlled buy in September also violated his Fourth Amendment rights.   Defendant relies on *Terry* to support the proposition that placement of a GPS device on a vehicle before securing a warrant is a flagrant violation of his Fourth Amendment rights.   (*See* ECF No. 83 at 6–12 (citing *Terry*, 2017 WL 1028590, at *3).)   As far as Defendant uses this argument to support his position that MDENT should have known that placement of a GPS before a warrant's issuance was unlawful, the Court reiterates its statement from the motions hearing that *Terry* is inapposite as it was decided over five months after the relevant events in this case unfolded.   (*See* ECF No. 80 at 78.)

Nevertheless, without commenting on the statements of law in the *Terry* opinion, the Court finds it wise to note the factual differences presented in this case.   The officer in *Terry* who testified at the evidentiary hearing stated that "he knew a warrant was required prior to placing the GPS unit," and the court there noted that the officer "omitted crucial pieces of information from his warrant application," such as the fact that agents already placed the GPS on the vehicle before applying for the warrant.   2017 WL 1028590, at *1.   Here, Det. Allen testified that he believed at the time, based on *United States v. Jones*, 565 U.S. 400 (2012), that placement of the GPS tracker on the vehicle without a warrant was lawful but actually monitoring the car required a warrant.   (*See* ECF No. 80 at 76.)   While Cpl. Hackney wrote in his affidavit attached to the search warrant application that he "intend[ed] on placing a [GPS]

16

favor suppression under the attenuation doctrine, law enforcement's misconduct must be purposeful and flagrant. Defendant dwells on facts in Det. Allen's initial warrant affidavit to search 3714 Virginia Avenue related to the drug paraphernalia and actual marijuana discovered during the trash pulls, noting that these facts may *only* indicate the personal use of marijuana. (*See* ECF No. 50-1 at 18–19.) However, Det. Allen provided in his affidavit that various plastic bags with corners removed were found during the trash pulls, which highlights "a common practice involving the *distribution* of marijuana." (*See* ECF No. 50-2 at 5–6 (emphasis added) ("Based upon my training and experience, I am aware that the items found within the trash are consistent with the use and possible distribution of marijuana.").) That the evidence found during the trash

---

tracking device on the vehicle," (ECF No. 50-7 at 5–6), Det. Allen testified at the hearing that he was unaware whether the warrant was signed at the time the tracking device was actually placed, (*see* ECF No. 80 at 74). However, while conceding Defendant's timeline of events for purposes of the attenuation analysis, (*see id.* at 27), the Government did not admit here that the warrant "was insufficient to establish probable cause" like it did in *Terry*. *See* 2017 WL 1028590, at *1. More notably, after placing the GPS device on the vehicle in *Terry*, law enforcement used data from the GPS to justify the traffic stop that led to the discovery of the challenged evidence. *Id.* at *2 ("Only after the speeding violation was confirmed via GPS data, [the officer] pulled over the Kia." (citations omitted)). Here, the Government maintains, and the Court agrees, that nothing fruitful emanated from the GPS tracking device, and unlike in *Terry*, the Government here does not plan to use any evidence obtained from the GPS in its case-in-chief. (*See* ECF No. 64 at 9–10; ECF No. 80 at 66, 108–09; ECF No. 84 at 3.)

As for placement of the GPS tracking device without a warrant, which the Court has assumed for the purposes of the analysis to be factually true and a constitutional violation, the Court does not find this to be so purposeful and flagrant to require suppression of evidence from the controlled drug buys. In *United States v. Martin*, police officers received a tip after a bank robbery that the defendant was one of the robbers, and officers attached a GPS device to his vehicle without a search warrant before tracking him into another state. *See* 712 F.3d 1080, 1081 (7th Cir.) (per curiam), *cert. denied*, 134 S. Ct. 471 (2013). A search of the car led to the discovery of drugs and a firearm, and the defendant moved to suppress that evidence. *Id.* At the time the vehicle was searched, police had probable cause for his arrest and reasonable belief that his vehicle contained evidence of the robbery. *See id.* The Seventh Circuit distinguished the facts from *Jones*—"where the GPS data was used to establish a necessary link between the defendant and a cocaine stash house"—by noting that the data from the GPS "appear[ed] simply to have aided law enforcement officials in tracking down Martin when they decided to effect his arrest," and the court refused to suppress the evidence. *See id.* at 1082 ("The evidence he seeks to suppress had little to do with the fact that a GPS device had been used at all: put differently, it was significantly 'attenuated' from the improper installation of the device."). Similarly, the evidence that Defendant seeks to suppress here is completely unrelated to the installation of the GPS tracker. Unlike in *Jones* and *Terry*, there is no basis here for believing that the GPS data led to the officers' seizure of the relevant evidence. *See* 565 U.S. at 402–03; 2017 WL 1028590, at *3. (*But see* ECF No. 83 at 11 ("[T]he GPS data gave the officers advance notice that Mr. Wilkerson would not likely be driving the Ford Expedition, and thus caused them to be on the lookout for a silver Mercedes during the latter two attempted controlled drug distributions.").) Accordingly, the Court does not find that the placement of the GPS device on the vehicle during the first controlled buy constitutes purposeful or flagrant conduct requiring suppression of evidence from any of the three controlled buys.

pulls is indicative of drug use or distribution is an opinion that an officer like Det. Allen is trained to make. Choosing not to characterize the evidence solely as evidence of marijuana use does not involve the omission of crucial information as *Franks* contemplated. *See* 438 U.S. at 155–56. As such, it is not entirely unreasonable for a magistrate judge, reading holistically the numerous facts presented in the affidavit, to make a determination of probable cause and sign the search warrant. *See United States v. Robinson*, 275 F.3d 371, 380 (4th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) ("In evaluating whether probable cause exists, it is the task of the issuing magistrate 'to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"). Thus, the Court finds unpersuasive Defendant's argument that the search warrant was so lacking in probable cause or omitted such crucial information to render Det. Allen's conduct purposeful or flagrant for purposes of the attenuation doctrine. *See United States v. Dubrowski*, No. 5:15CR15, 2015 WL 1965198, at *6–7 (N.D. W. Va. Apr. 30, 2015) (discussing *Franks*, 438 U.S. at 155–56; *Seidman*, 156 F.3d at 548).

Defendant also argues that the subsequent search warrant for the vehicles and storage unit similarly violated his constitutional rights by intentionally and recklessly including materially false statements and omitting other material information. (*See* ECF No. 50-1 at 21–25.) Again, even assuming that Defendant is correct, the Court does not find that the affidavits attached to the search warrant, in light of the facts proffered by Defendant, amount to the type of "deliberate, reckless or grossly negligent" conduct that the attenuation doctrine seeks to prohibit.[8] *See Herring v. United*

---

[8] Defendant further argues the following as evidence of purposeful or flagrant conduct that requires suppression of the evidence in this case: (1) law enforcement did not promptly arrest Defendant after a state warrant was issued in August 2016, (2) a confidential informant drove to the controlled buys without a valid license, (3) a confidential informant was on probation and was a fugitive as of the day of the third controlled buy, and (4) the recording devices

used in the buys were not registered in accordance with state law.  (*See* ECF No. 50-1 at 30–33; ECF No. 83 at 12–34.)  Despite the numerous pages spent on these arguments in Defendant's post-hearing brief, Defendant cites only one case that suggests evidence may be suppressed for any of these reasons. (*See* ECF No. 83 at 22–23 (citing *Spicer*, 2016 WL 7493975, at *1)); *see also* ECF No. 80 at 100 ("I mean, I don't have a case to cite to the Court that says this is illegal; therefore, suppress all the evidence."), 102 ("[W]hat law do we have that says, you know, suppression is the appropriate remedy when that happens?  I don't have anything.  I have looked.").)

In *Spicer*, the court found no constitutional violation where a confidential informant drove by himself to the site of a controlled buy without a license.  *See* 2016 WL 7493975, at *3.  As to certain public safety concerns involving the confidential informant in *Spicer*, the court noted the following:

> As Cpl. Vernon testified, the CI was allowed to drive to the site of the controlled buy, even though it was known that the CI had no license to drive a vehicle.  The CI was allowed to do so by virtue of the CI's explanation to the law enforcement officers that it would have been highly unusual for the CI to be accompanied by anyone else at the time that the CI was to meet with the defendant for the purpose of making a buy inasmuch as the CI had similarly engaged with him on earlier occasions while alone.  If the CI were to bring someone else along, the deal would not close and the CI's safety would be endangered.

*Id.*  Defendant attempts to distinguish the current facts by arguing that "the safety concerns identified in *Spicer* were absent from Mr. Wilkerson's case because . . . there would have been nothing unusual about having a second CI accompany CI #1 for the third buy."  (ECF No. 83 at 23.)  Even assuming that is true, the Court does not find that distinction of consequence, and the Court also finds based on the testimony at the motions hearing that allowing CI #1 to drive to the controlled buys was actually less risky to public safety than in *Spicer*.  The situation in *Spicer* was described as follows:

> [T]he CI used by law enforcement authorities drove . . . without a valid license . . . , having had the privilege revoked on or about January 16, 2009, due to driving while under the influence with a minor under the age of sixteen . . . ; and on or about August 16, 2015, the CI was charged with driving under the influence of a controlled substance (heroin), driving on a revoked license for driving under the influence and two charges of simple possession of marijuana and heroin, the CI having pled guilty on February 23, 2016, to driving under the influence and a violation of controlled substances for which the CI received a 90-day suspended sentence for six months of unsupervised probation.

2016 WL 7493975, at *1.  Further, the officers following the CI's vehicle in *Spicer* "lost it at one point in traffic" on the way to the buy.  *Id.* at *3.  Here, when asked why CI #1 did not have a driver's license, Cpl. Hackney stated at the hearing that "[i]t may have been for some unpaid citation . . . it wasn't for a DUI," he did not believe.  (ECF No. 80 at 83.)  Cpl. Hackney also testified that CI #1 "didn't seem impaired by any means," did not "express any hesitation . . . about driving to the scene without a license," and was in sight of officers in the "following car the entire time[.]" (*Id.* at 85 ("He didn't appear to be on any drugs or alcohol.  I couldn't smell nothing on his breath."), 87, 89 ("Q. And he didn't lose you in traffic during any of that?  A. No.").)

Ultimately, Defendant provides no relevant legal basis for suppressing evidence from the controlled buys based on these remaining arguments.  Potentially, if Defendant could show that the conduct was so outrageous as to constitute a due process violation, this may be a basis for suppression, but "it is well settled that the 'exclusionary rule'—on which [Defendant] relies—is generally reserved to serve as a remedy for violations of *specific* constitutional rights, rather than broad generalized rights" as he seems to argue.  *See United States v. Hasan*, 846 F. Supp. 2d 541, 545–47, 549 (E.D. Va. 2012) (emphasis in original) (citing *United States v. Goodwin*, 854 F.2d 33, 37 (4th Cir. 1988)).  The conduct described does not amount to such outrageous or shocking misconduct to support suppression, and it does not act to avert application of the attenuation doctrine.

*States*, 555 U.S. 135, 144 (2009), *quoted in United States v. Davis*, 690 F.3d 226, 253 (4th Cir. 2012); *see also Robinson*, 275 F.3d at 380 (citing *Gates*, 462 U.S. at 236) ("Indeed, the Supreme Court in *Gates* specifically cautioned against 'hypertechnical' scrutiny of affidavits lest police officers be encouraged to forgo the warrant application process altogether."); *cf. Najjar*, 300 F.3d at 479 (agreeing with the district court that the officer's search warrant affidavit did not demonstrate an "intent to deceive the judge" who signed the warrant).

In terms of intervening circumstances, the Court finds significant the fact that a confidential informant approached law enforcement of his own free will—independent from and unaware of the May 2016 searches—with information about Defendant's drug distribution activities. The following passage from the *Ceccolini* Court is exceptionally informative in light of the relevant facts before this Court:

> Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence.

435 U.S. at 276–77.

Defendant makes much of the testifying officers' admissions that they suspected "Dub," as CI #1 referred to him, to be Defendant based on information learned from the May 2016 searches. (*See* ECF No. 83 at 2–6.) However, both officers confirmed that they could not be certain that the suspect was Defendant until he showed up to the first controlled buy. (ECF No. 80 at 42–43, 46–47.) Further, Det. Allen testified that regardless of whether the officers thought Defendant was involved, the tip provided by CI #1 is one that MDENT would pursue without hesitation. (*Id.* at 51 ("Q. If you have a CI come to you and say, 'I've been purchasing ounce

quantities of methamphetamine', is that somebody that you're probably going to want to make [a] controlled purchase from? . . . A. Absolutely, regardless of who it is. . . . [E]ven if it wouldn't have been Mr. Wilkerson, the next day, we would have still continued to do the case."); *see also id.* at 37 (indicating that CI #1 told Cpl. Hackney that he "had originally purchased four ounces of meth from ["Dub"] and then up to a kilo off of [him]").)   It is worth reiterating that at the time CI #1 approached MDENT, Defendant was not a target of investigation.   (*See id.*)   For these reasons, the Court finds that CI #1's decision to come forward with unrelated information over four months after the allegedly unlawful searches occurred is a clear intervening circumstance for purposes of attenuation.   *See Strieff*, 136 S. Ct. at 2061.

As the Government stressed at the pretrial motions hearing, suppressing evidence from the controlled drug buys in this case does not advance the policy justification for excluding tainted evidence.   (*See* ECF No. 80 at 34 ("[I]f we follow Defendant's argument to the end, essentially, once a person has been subjected to an illegal search, officers can never follow up on any other information or never ask another witness about them.").)   Defendant argues that his right to be free from unreasonable searches was violated in May 2016.   The circumstances leading to his arrest for the instant offense, however, do not flow from those prior searches, and Defendant's interest in that constitutional right would not be served by suppressing the obtained evidence from the unrelated September 2016 controlled buys.   *See Strieff*, 136 S. Ct. at 2061.   The Government has met its burden in showing that the attenuation doctrine applies in this case, and because the evidence from the controlled buys is not derivative from those searches, it should not be

suppressed.[9]   *See Segura*, 468 U.S. at 804; *see also United States v. Burke*, 605 F. Supp. 2d 688, 696–97 (D. Md. 2009).

### B.   Custodial Statements

The Fifth Amendment of the U.S. Constitution protects criminal suspects from being compelled to make incriminating statements against themselves.   *See* U.S. Const. amend. V; *see also Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966) (laying out four core warnings that must be given to criminal suspects under certain circumstances).   These rights are implied rights grounded in the Fifth Amendment's Self-Incrimination Clause.   *See Miranda*, 384 U.S. at 468–69.   After *Miranda* rights have been given and upon a Defendant's request for counsel, all questions from law enforcement must cease until an attorney is present.   *Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (citing *Michigan v. Mosley*, 423 U.S. 96, 104 n.10 (1975)).

Defendant claims that on May 5, 2016, during the search of 3714 Virginia Avenue, he was handcuffed and read his *Miranda* rights.   (ECF No. 51 at 1.)   He further states that he requested to speak to an attorney, after which time Det. Allen asked Defendant at least three questions.   (*Id.*)

---

[9] The United States also argues in its response to the suppression motion that the independent source doctrine provides a separate basis for denying Defendant's motion.   (*See* ECF No. 64 at 8–9; *see also* ECF No. 80 at 107–08.)   The independent source doctrine applies "to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality."   *See Murray v. United States*, 487 U.S. 533, 537 (1988).   Even assuming, without deciding, that the evidence obtained during the September 2016 controlled buys was somehow the consequence of the May 2016 searches, the Court has already discussed that the facts show that that evidence resulted from information obtained from CI #1, who clearly is an independent source for purposes of the doctrine, *see id.* at 541–42; *see also Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir.), *cert. denied*, 483 U.S. 1023 (1987) ("The critical inquiry under the independent source doctrine is whether the challenged evidence was obtained from lawful sources and by lawful means independent of the police misconduct."), despite Defendant's suggestion that no confidential informant "can be truly independent," (*see* ECF No. 80 at 92).   Thus, the evidence was lawfully seized and "genuinely independent" of any allegedly unlawful search in May 2016.   *See United States v. Forsythe*, No. 3:11–00202, 2012 WL 75053, at *4 (S.D. W. Va. Jan. 10, 2012).   Nonetheless, the above application of the attenuation doctrine is sufficient to show that the exclusionary rule should not apply in the circumstances before the Court, and further analysis under the independent source doctrine is unnecessary.   *See Ceccolini*, 435 U.S. at 273–80 (noting that evidence will be admissible under the attenuation doctrine even if it is not derivative of an independent source if the causal connection between the unlawful conduct and the discovery of evidence is so attenuated to dissipate the taint).

Defendant specifically provides the following from Det. Allen's report regarding the continued questioning:

> "I attempted to ask [Defendant] if he had any valid employment, in which he attempted to detour the conversation and acted like he did not understand the questioning." He continues, "I attempted to ask [Defendant] who the registered tenant of the residence was, but once again he pretended to be confused by my questions." Finally, "I then asked him if his Federal Probation Officer was aware that he was living at this address, and he said yes."

> Additionally, in a later search warrant application, Detective Allen related that he "initially asked [Defendant] for consent to search these vehicles, and he became very hyper and started yelling at me that he wanted a lawyer."

(*Id.* at 1–2.)   Defendant argues that any statements he made in response to Det. Allen's questions violate his Fifth Amendment rights and that they must be suppressed.   (*Id.* at 2.)

Even assuming that Defendant's Fifth Amendment rights were violated when Det. Allen continued asking Defendant questions, the Government has assured the Court that it does not plan to use at trial any statements made by the Defendant on May 5, 2016.   (*See* ECF No. 80 at 5.) Because the United States does not plan to use Defendant's statements as evidence in its case-in-chief, the Court **DENIES AS MOOT** Defendant's Motion to Suppress Custodial Statements. (ECF No. 51.)

### C.   *Potential Penalties Defendant Faces*

The United States filed a Motion in Limine to Exclude Arguments and Evidence Regarding Potential Penalties Facing Defendant.   (ECF No. 47.)   The Government seeks to prevent Defendant from presenting to the jury the potential penalties he faces upon conviction, including mandatory minimums.   The motion argues that this information is irrelevant and improper, (*see id.* at 1–2 (citing *Shannon v. United States*, 512 U.S. 573, 579 (1994); *Rogers v. United States*, 422 U.S. 35, 40 (1975); *Sparf v. United States*, 156 U.S. 51, 101–06 (1895); Fed. R. Evid. 401)), and

would only serve to encourage jury nullification, (*id.* at 3). Defendant's response argues that "[j]ust because the jury should not base its verdict upon the potential penalty facing a defendant does not mean that the jury should not be informed of the potential penalty." (ECF No. 73 at 2.) Defendant distinguishes the facts here from those in the cases cited by the Government and argues that "elementary notions of fairness require that the jury be informed regarding the potential penalty of life imprisonment," supporting Defendant's desire to impress upon the jury the seriousness of their role. (*See id.* at 2–4.) Defendant further states that no argument will be presented regarding jury nullification or "that the jury should acquit him because of those potential penalties." (*Id.* at 4–5 (arguing that forbidding Defendant from informing the jury of potential penalties "would also violate [his] due process right to a fair trial").)

"It is well established that when a jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon*, 512 U.S. at 578 (quoting *Rogers*, 422 U.S. at 40); *see also United States v. Chesney*, 86 F.3d 564 (6th Cir.) (holding that the district court did not err in refusing to allow defendant to argue about his possible punishments), *cert. denied*, 520 U.S. 1282 (1996). "Absent a statutory requirement that the jury participate in the sentencing decision, nothing is left for jury determination beyond the guilt or innocence of an accused." *United States v. Greer*, 620 F.2d 1383, 1384 (10th Cir. 1980) (internal quotation marks omitted) (citation omitted) ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial."). The Sixth Circuit held in *Chesney* that this rule applies where a statutory mandatory minimum sentence would apply upon conviction. *See* 86 F.3d at 574.

The Court finds no reason to deviate from the well-settled case law on this issue. Defendant attempts to persuade the Court that a jury instruction would "strike a balance between the Government's concerns about jury nullification and defendant's concerns that the jury must appreciate the seriousness of this case . . . ." (ECF No. 73 at 6.) The Court acknowledges the novelty of Defendant's argument, but it is constrained by the Federal Rules of Evidence and the jurisprudence interpreting it. Case law aside, Federal Rules of Evidence 401, 402, and 403 guide this Court in reaching its conclusion. First, any potential penalty Defendant might face does not make any fact in this case more or less probable and is not of consequence in determining the action. *See* Fed. R. Evid. 401. Because such potential penalty is not relevant, it is not admissible. Fed. R. Evid. 402. Further, this Court is deeply concerned about the possibility that the jury might "nullify" its verdict if Defendant is able to express that he may face extremely serious penalties as a result of the jury's verdict. The jury in the upcoming trial will have no sentencing function, and no statute here requires that it be informed of the consequences of its verdict. While the Court perceives no probative value in informing the jury about the length of Defendant's potential sentence, there would be a toxic prejudicial effect if a sympathetic jury realizes that its decision may result in life imprisonment for Defendant as he suggests. *See* Fed. R. Evid. 403; *cf. United States v. Cropp*, 127 F.3d 354, 359 (4th Cir. 1997) (recognizing "certain prejudice that would result from a sympathetic jury when it learns that its verdict of guilty will result in sentences of ten and twenty years in prison"). Accordingly, the Court **GRANTS** the United States' Motion in Limine to Exclude Arguments and Evidence Regarding Potential Penalties Facing Defendant, (ECF No. 47), and references to the sentence potentially faced by Defendant will be excluded at trial.

*IV. CONCLUSION*

For the reasons set forth above, the Court **DENIES** Defendant's Motion to Suppress Evidence of Alleged Drug Distributions, (ECF No. 50-1), **DENIES AS MOOT** Defendant's Motion to Suppress Custodial Statements, (ECF No. 51), and **GRANTS** the United States' Motion in Limine to Exclude Arguments and Evidence Regarding Potential Penalties Facing Defendant, (ECF No. 47).

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:      November 20, 2017

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE